UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CHRIS BIANCHI,

                              Plaintiff,

                                                        Case # 16-CV-6840-FPG

v.

                                                        DECISION AND ORDER

ROCHESTER CITY SCHOOL DISTRICT, et al.,

                              Defendants.

## INTRODUCTION

*Pro se* Plaintiff Chris Bianchi[1] brings this employment discrimination action against Defendants Rochester City School District, Bryant Cromartie, and Rodney Moore. Defendants have moved for summary judgment on all of Bianchi's claims. ECF No. 38. Bianchi opposes the motion. ECF No. 56. In addition, Defendants have filed a motion for miscellaneous relief. ECF No. 57. The Court resolves both motions in this omnibus order. For the reasons that follow, Defendants' motion for summary judgment is GRANTED, and their motion for miscellaneous relief is GRANTED IN PART and DENIED IN PART.

## LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding

---

[1] Throughout much of this case, Bianchi was represented by counsel. After Defendants filed their motion for summary judgment, his counsel withdrew. *See* ECF No. 48.

whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). However, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotation omitted).

## BACKGROUND

Consistent with the applicable standard of review, the following narrative consists of the undisputed facts and the disputed facts taken in the light most favorable to Bianchi. *Logical Operations Inc. v. 30 Bird Media, LLC*, 354 F. Supp. 3d 286, 293 (W.D.N.Y. 2018).

Bianchi is Caucasian and has been employed as a teacher for the school district since 2007. From July 2012 to November 2015, Bianchi worked at the Nathaniel Rochester Community School—where the events underlying this litigation took place. During Bianchi's tenure, Cromartie was the assistant principal and Moore was the principal of the school. Both are African-American.

The relevant events begin in May 2014. At that time, Brian Santillo, a Caucasian teacher at the school, wrote an email complaining about how Frances Rogers, a union representative and fellow school employee, handled his grievances about the school's testing procedures. Rogers is African-American. In a responding email, another African-American teacher challenged Santillo's claims and implied that Santillo was targeting the African-American union representatives for criticism.

Rogers did not immediately wade into this dispute, but about a month later she sent out a schoolwide email with an inspirational quote about adversity. Rogers gloated that her "haters" could not get "rid of [her]" despite their "plotting against [her]." Pl. Ex. B-4. Although it did not

directly involve him, Bianchi cites this incident as evidence of Rogers's bias against Caucasian co-workers.

Bianchi and Rogers's conflict began in Fall 2014. One of Rogers's responsibilities was to oversee the program implementing alternatives to suspension. On October 3, 2014, Bianchi sent a student out of the classroom and referred him to suspension, but Rogers returned the student to class. Bianchi complained to Principal Moore that he found it offensive he was "lectured by a substitute administrator" about classroom management. Pl. Ex. C7 at 43. On another occasion, while Bianchi was speaking with two students in his classroom, Rogers entered and yelled that the students should be going to their next class.

On October 20, 2014, Rogers sent out an email regarding teachers' classroom management. In a reply email, Bianchi questioned Rogers's credentials, her authority to set policies, and argued that "[t]eachers should not be giving teachers directives." *Id.* at 51. He called Rogers by her first name—Frances—in his email. *Id.* Rogers responded that she found his reply "amusing," asserted that he should not "indirectly attack [her]," and stated that she did not want Bianchi addressing her by first name. *Id.* at 50.

On Halloween, Bianchi came to school dressed as Francis Scott Key. He wore a name tag that said "Frances" on it. Although Bianchi argues that this costume was not provocative, Rogers believed that Bianchi's costume was intended to antagonize her. She filed an administrative discrimination complaint against Bianchi, which was later deemed unfounded.

On December 19, 2014, Bianchi and Rogers were in the school office at the same time. Bianchi was speaking with a student about his Christmas costume. He said, "[If] you liked my Halloween costume[,] you will love this." Pl. Ex. C1 at 95. At that moment, Rogers confronted Bianchi and asked if he was "trying to be funny." *Id.* Bianchi and Rogers argued back and forth

until Bianchi left with the student, placing his arm on her shoulder. As they walked down the hallway, Rogers followed behind them yelling "INAPPROPRIATE TEACHER-STUDENT CONTACT!" *Id.* at 96. Bianchi claims that the contact was, in fact, appropriate. Later that day, Rogers and another teacher, Jewell Brown, attempted to convince the student to say that the contact had been inappropriate. This failed: Bianchi asserts that at a subsequent meeting between Bianchi, Rogers, Moore, Cromartie, the student, and the student's mother, it was found that "Bianchi was telling the truth and Rogers was lying." ECF No. 56 at 14. Nonetheless, Bianchi claims that, after the incident, other staff members sometimes joked about him "inappropriately touching students." Pl. Ex. C3 at 131.

In addition, at some point on the same day, Rogers emailed senior school-district administrators complaining that a flier Bianchi had disseminated was offensive.

On January 15, 2015, while Bianchi was walking down the hallway, a student yelled "Hi Uncle Bianchi" from an adjacent office. Brown was in the office at the time. When Bianchi greeted the student, he noticed Brown whisper in the student's ear. Later, the student reported that Brown had discouraged her from calling Bianchi by that term.

On February 25, 2015, Bianchi and Rogers had another conflict when Rogers entered his classroom without permission. The record does not disclose the details of this incident.

Bianchi constantly complained of Rogers's actions during the 2014-2015 school year to school officials. In Bianchi's view, however, neither Moore nor Cromartie took sufficient action to respond to his complaints or discipline Rogers.

At the start of the next school year, Bianchi clashed with Clara Berry, an African-American special education teacher. Berry provided services to some of the students in Bianchi's classroom. After class on Thursday, September 17, 2015, Berry confronted Bianchi, asserting that he was not

following the curriculum correctly. She also implied that he helped his students cheat on their final examinations.

Later that day, Bianchi met with Cromartie and Berry to discuss the confrontation. During the discussion, Berry accused Bianchi of having dressed in "blackface." She also questioned why Bianchi—*i.e.*, a Caucasian man—was playing Bob Marley in class. Bianchi reported Berry's comments to Moore, concerned that the rumor would poison his relationship with African-American staff members and students. Bianchi, Moore, and Cromartie all discussed the issue and agreed that the rumor was slanderous and created a hostile work environment.

Moore instructed Bianchi to stay home on Friday until he could make a plan to remedy the situation. On Sunday, Moore and Bianchi spoke by phone. Bianchi vented his frustration about the rumor and expressed his concern about how staff, parents, and students would treat him.[2] Bianchi stated that the "best thing for [him] to feel comfortable" would be to take Monday off until a plan could be formulated that would allay his concerns about Berry and the rumors. Pl. Ex. W9 at 13:45. Bianchi elaborated that he could have an "edge" when someone intimidates him, and he did not want to put himself in a situation where that "side" of him would "come out." Moore agreed with that approach.

Bianchi took work off on Monday, September 21, 2015. Later that day, Moore and Bianchi spoke by phone to assess the situation. Bianchi reiterated his concerns about the rumor and informed Moore that he was meeting with the investigator on Thursday. Bianchi suggested that he meet with the investigator and then come "into school after [he] talk[s] with the guy." Pl. Ex.

---

[2] Defendants argue that the audio recordings should not be considered because, *inter alia*, they have not been properly authenticated. Given that the recordings were produced in discovery, Defendants had an opportunity to question Bianchi about their authenticity during his deposition, Defendants do not suggest that it would be impossible for Bianchi to authenticate the recordings at trial, and Bianchi is proceeding *pro se*, the Court will not exclude the audio recordings from consideration. *See Gordon v. Kaleida Health*, 299 F.R.D. 380, 393 (W.D.N.Y. 2014).

W10 at 16:45.  Moore responded that he was "not telling [Bianchi] what to do" but that "may be the best thing."  *Id.*

On Thursday, September 24, 2015, Bianchi spoke with Moore by phone.  During that conversation, Bianchi noted a union representative's suggestion that he stay home on Friday and "start fresh on Monday."  Pl. Ex. W8 at 3:20.  Moore stated that he "was going to say that too." *Id.*  They agreed that Bianchi would return to school on Monday.

Bianchi returned to work on Monday, September 28, 2015, but not without incident.  While Bianchi was walking in the hallway, Berry aggressively approached him, stepped into his personal space, and sarcastically stated "WELCOME BACK."  Bianchi and Rob Burns, an assistant principal at the school who witnessed the incident, immediately informed Moore.  Bianchi alleges that Moore was unduly skeptical and questioned whether Berry had actually made the statement in a "taunting way."  ECF No. 38-3 at 44.

After this incident, Moore told Bianchi to "go home and [that] he would contact him when he had everything figured out."  ECF No. 56 at 33.  Bianchi remained out of school on paid leave for approximately one month.

On October 26, 2015, while still out on leave, Bianchi met with Maurice Snipe, the Director of Human Resources for the school district.  Snipe told Bianchi that "it [was] time to return to work" and that he had "been off long enough."  ECF No. 56 at 45.  When Bianchi questioned what measures would be taken to ensure his wellbeing, Snipe indicated he did not know.  In light of that, Snipe agreed to investigate whether there were any open positions to which Bianchi could transfer.

Snipe found an opening for Bianchi as an itinerant social studies teacher.  Bianchi claims that this position had significantly worse working conditions than his present position.  But in

Bianchi's view, he had "no other option but to either return to a racially hostile work environment or transfer to a very undesirable new position." ECF No. 56 at 45. As a result, he accepted the position.

Before transferring, Bianchi returned to the Nathaniel Rochester school for a few days. In that time, Berry again started a conflict with Bianchi. Specifically, on November 3, 2015, Berry burst into Bianchi's room and told some students to come with her. Bianchi and Berry argued, with Bianchi telling her that, per Moore, she was not supposed to have contact with him.

After the incident, Bianchi wrote to several school and district officials expressing his anger and frustration that he had been "forced" back to school given the "horrible working conditions." ECF No. 38-11 at 17. In response, the district gave Bianchi paid administrative leave until he began his new position on November 9, 2015. Once in his new position, Bianchi found that it entailed substantially more work than Snipe had originally led him to believe.

Over the course of these events, Bianchi filed three formal discrimination complaints with the district, in addition to numerous informal complaints to school and district officials. He filed his first complaint on September 21, 2015—after he learned of the "blackface" rumor—against Berry and Rogers. He alleged that Berry's comments were discriminatory and that Rogers had started the rumor. The internal investigator concluded that Bianchi's complaints of discrimination were "unprovable." Bianchi asserts that the investigator did not conduct a fair or thorough investigation and that Moore, Cromartie, and other co-workers provided false or misleading testimony that undermined the investigation.

Bianchi alleges that he filed a second complaint on October 24, 2015. In this complaint, Bianchi asserted that Berry had engaged in racial discrimination and retaliation when she aggressively said "Welcome Back" to him on September 28, 2015. Defendants contend that

Bianchi never, in fact, submitted this complaint to the school district. In any case, the complaint was not investigated.

Bianchi filed his third complaint on November 23, 2015. This complaint concerned the November 3, 2015 incident wherein Berry burst into Bianchi's classroom uninvited. The internal investigator concluded that Berry had engaged in unprofessional conduct and had violated Moore's directive that she limit her interactions with Bianchi. The investigator concluded that Berry's actions were not the result of race discrimination, however. Moore issued a written reprimand against Berry for her conduct. *See* ECF No. 38-4 at 2.

In December 2016, Plaintiff brought this complaint. He raises eight claims: (1) hostile work environment in violation of Title VII of the Civil Rights Act of 1964 against the school district; (2) disparate treatment in violation of Title VII against the school district; (3) retaliation in violation of Title VII against the school district; (4) hostile work environment in violation of the New York State Human Rights Law ("NYSHRL") against all defendants; (5) disparate treatment in violation of the NYSHRL against all defendants; (6) retaliation in violation of the NYSHRL against all defendants; (7) an equal protection violation under 42 U.S.C. § 1983 against Cromartie and Moore; and (8) a state-law equal protection claim against all defendants. *See* ECF No. 3.

## DISCUSSION

Before the Court are two motions: Defendants' motion for summary judgment and their motion for miscellaneous relief. The Court begins by addressing some preliminary evidentiary issues before delving into the motion for summary judgment.

### I.    Evidentiary Issues

Bianchi filed a voluminous opposition to Defendants' motion, including a statement of facts and supporting affidavit that, combined, are nearly 150 pages. In doing so, Bianchi has

submitted a variety of evidence that the Court may not consider because it would be inadmissible at trial. *See Debrosse v. City of New York*, 739 F. App'x 48, 49 (2d Cir. 2018) (summary order). Given the large volume of evidence that Bianchi has tendered, it is neither practical nor necessary to exhaustively identify each piece of inadmissible evidence on which Bianchi relies. However, the Court will highlight two categories of evidence that it will not consider: hearsay evidence and evidence from witnesses who were not identified in Bianchi's initial disclosures.

Hearsay is an out-of-court statement, "made by someone other than the witness," that is "offered for the truth of the matter asserted." *Bldg. Indus. Fund v. Local Union No. 3, Int'l Brotherhood of Elec. Workers, AFL-CIO*, 992 F. Supp. 162, 173 (E.D.N.Y. 1996). Unless an exception applies, hearsay evidence is inadmissible at trial. Fed. R. Evid. 802. For example, the audio recoding of Jewell Brown indicating that Rogers and Berry are "anti-white" is hearsay insofar as it is offered to prove the truth of that assertion. *See, e.g.*, *Juice Entertainment, LLC v. Live Nation Entertainment, Inc.*, No. 11-7318, 2018 WL 2357748, at *4 (D.N.J. May 23, 2018). Indeed, most of the audio recordings that Bianchi has submitted present hearsay problems, as they are offered to prove the assertions of the speakers. Also hearsay is Bianchi's allegation that Cromartie told him that Berry said Rogers was the source of the "blackface" rumor. *See Howley v. Town of Stratford*, 217 F.3d 141, 155 (2d Cir. 2000) (plaintiff's testimony that co-workers informed her of supervisor's statements would be inadmissible to prove that the supervisor "actually made such statements").

The other issue that must be addressed is Bianchi's violation of Rule 26(a)(1). Under that rule, each party is obliged to provide the opposing party with the name of "each individually likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i). Bianchi's initial disclosure does not identify several of

the witnesses on which he now relies, including Edith Sanders, Sarah Cooley, Michael Germain, Wanda Zawaldski, and Ashley Williams. Bianchi does not dispute that he failed to disclose these witnesses.

Bianchi's violation implicates Rule 37(c)(1), which provides, "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Defendants ask the Court to preclude Bianchi from relying on these witnesses. "In determining whether it should exercise its discretion and preclude evidence, a court must consider . . . (1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Giudice v. Harlan*, No. 15 Civ. 7330, 2017 WL 564085, at *3 (S.D.N.Y. Feb. 10, 2017) (internal brackets omitted). "The imposition of an order of preclusion does not require a showing of bad faith on the part of the offending party." *Id.*

Having considered these factors, the Court agrees that preclusion is appropriate under the circumstances. On the first factor, Bianchi has not provided a persuasive explanation for his failure. Although he contends that Defendants raised new issues on summary judgment, many of these witnesses simply offer evidence relating to the underlying discrimination claims and cannot be attributed to some unexpected defense. For example, Michael Germain's claim that Rogers had targeted Caucasian teachers in the past would have been relevant from the outset of this litigation. Bianchi also attempts to blame his prior counsel for the error. This falls flat because "a client is ordinarily bound by the acts of his lawyer," *Dodson v. Runyon*, 86 F.3d 37, 40 (2d Cir. 1996), even

where prior counsel was allegedly negligent. *See Bruce Lee Enters., LLC v. A.V.E.L.A., Inc.*, No. 10 CV 2333, 2013 WL 364210, at *2 (S.D.N.Y. Jan. 30, 2013).

The second factor—the importance of the evidence—is at best neutral: much of the evidence is inadmissible on hearsay grounds, though some of it sheds light on the events underlying Bianchi's claims.

The third and fourth factors strongly favor Defendants. Defendants have had no opportunity to investigate or examine the allegations raised by these witnesses, and given the sheer length of time this motion has been pending, it would be impracticable and unfair to continue the case. Accordingly, these factors favor preclusion of this evidence, and the Court will not consider the evidence from Bianchi's undisclosed witnesses in resolving Defendants' motion.

In short, the reason why the Court omits discussion of much of the evidence that Bianchi proffers is because it contains inadmissible hearsay or comes from undisclosed witnesses.

## II. Hostile Work Environment Claims

Under Title VII and the NYSHRL, Bianchi claims that he was subjected to a hostile work environment. His claims are primarily based on the actions of Rogers, Berry, and Brown during the 2014-2015 school year and Fall 2015.

To prevail on a hostile work environment claim, Bianchi must show: "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment, and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer." *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013). "[A] plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. This standard

has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 320-21 (2d Cir. 2015) (internal quotation marks and citations omitted). A plaintiff must also produce evidence that the hostility occurred because of his protected characteristic. *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014). In determining whether an environment is "hostile" or "abusive," courts may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. . . . [But] no single factor is required." *Howley*, 217 F.3d at 154 (internal quotation marks and citation omitted).

Even looking at the evidence in the light most favorable to Bianchi, no reasonable juror could conclude that the harassment to which he was subjected was either severe or pervasive. In Fall and Winter 2014, Bianchi and Rogers had a handful of conflicts in the workplace, but they were sporadic incidents that cannot be said to have permeated the workplace. *See, e.g.*, *Stepheny v. Brooklyn Hebrew Sch. for Special Children*, 356 F. Supp. 2d 248, 264-65 (E.D.N.Y. 2005) (co-worker's "utterance of 'white bitch' or some variation thereof to [plaintiff] five times over an approximately five-month period" was insufficient to support claim for hostile work environment). Indeed, the conflicts did not overtly implicate or target Bianchi's race. At least on their face, the incidents arose from Bianchi and Rogers's mutual enmity over Rogers's role in the school, and thus "reflected a clash of personalities rather than a discriminatory animus."[3] *Kodengada v. Int'l Bus. Machs. Corp.*, 88 F. Supp. 2d 236, 243 (S.D.N.Y. 2000).

---

[3] The evidence on which Bianchi relies to assert that Rogers is racist, "anti-white," and spread the "blackface" rumor is inadmissible hearsay and may not be considered. *See* Fed. R. Civ. P. 56(c)(2).

In Fall 2015, Bianchi was subjected to hostility from Berry. While Berry's hostility more overtly implicated Bianchi's race, the incidents were also episodic in nature; they were not continuous conflicts that permeated the workplace and thereby altered Bianchi's working conditions.

And even if it was false and frustrating, Bianchi has not proffered sufficient evidence that the "blackface" rumor created a hostile work environment. He asserts that a few co-workers appeared to act differently towards him and that Berry expressed outright hostility due to the rumor, but the record lacks evidence to suggest that the rumor had any widespread impact. *See Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 304 (4th Cir. 2019) (rumor that employee had sexual relationship with boss sufficient to state a claim, where employee alleged that rumor caused her to be physically threatened, led to "open resentment and disrespect" from co-workers, and significantly interfered with her work). Absent more tangible harm, Bianchi's subjective fear that the rumor would ultimately impact his working relationships is not enough to support his claim. *See Whitright v. Hartford Pub. Schs.*, 547 F. Supp. 2d 171, 177 (D. Conn. 2008) (stating that a hostile work environment claim requires both that the victim "subjectively perceive that the environment [is] abusive" and that the misconduct be "severe or pervasive enough to create an objectively hostile or abusive work environment").

Even if the Court were to look at all these incidents in their totality, there is insufficient evidence to establish that Bianchi was subjected to severe or pervasive harassment.[4] This is not to say that the treatment Bianchi received from co-workers was fair or professional, only that the evidence he has marshalled is insufficient to meet the high standard required to establish a hostile

---

[4] To the extent Bianchi argues that school officials' failure to remediate the hostile work environment thereby contributed to it, the Second Circuit has rejected that logic. *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 724 (2d Cir. 2010).

work environment claim. *See Epstein v. Cty. of Suffolk*, No. 14-CV-937, 2016 WL 4257349, at *6 (E.D.N.Y. Aug. 11, 2016) ("Courts in this Circuit have recognized that a plaintiff's burden is "remarkably high.'").

Therefore, Defendants are entitled to summary judgment on Bianchi's hostile work environment claims.

## III.    Disparate Treatment

Under Title VII and the NYSHRL, a plaintiff may establish a claim of disparate treatment "by showing that he has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race [or] color." *Price v. Cushman & Wakefield, Inc.*, 829 F. Supp. 2d 201, 219 (S.D.N.Y. 2011).  An adverse employment action is "a 'materially adverse change' in the terms and conditions of employment, which is 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id.*; *Davis v. NYS Dep't of Corrs. Attica Corr'l Facility*, 46 F. Supp. 3d 226, 234 (W.D.N.Y. 2014).  Examples of adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Price*, 829 F. Supp. 2d at 219.

Bianchi identifies droves of actions that he believes were motivated by racial discrimination on the part of school officials and his co-workers.  Having reviewed Bianchi's opposition materials, the Court will confine its analysis to only those actions that are even arguably adverse under the applicable standard.

First, Bianchi points to his paid leave in Fall 2015 as an adverse employment action.  The Second Circuit has held that placement on administrative leave with pay during an investigation

is not an adverse employment action, reasoning that "the terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances." *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006). Although Bianchi's leave was different because it was informal and he was not the target of an internal investigation, he nonetheless fails to present facts to show that his short paid leave resulted in any tangible negative changes to his employment conditions. *See Ishoo v. Bd. of Regents Univ. of New Mexico*, No. CIV-06-0747, 2007 WL 9729216, at *9 (D.N.M. Sept. 29, 2007) ("In most cases, restoration of an employee to his or her original position at the end of a short paid suspension results in the employee suffering no loss in pay, benefits, or position.").

Leaving aside the absence of an adverse action, Bianchi could not otherwise make out a claim based on his paid leave. Defendants' proffered justification for the leave was that Bianchi felt uncomfortable returning to school given the co-worker conflicts and "blackface" rumor. *See* ECF No. 38-44 at 25 (deposition of Rodney Moore). Indeed, Bianchi suggested such leave himself in his phone calls with Moore. And at the end of his nearly monthlong leave, Bianchi did not lobby to return to school but actively protested against it. *See, e.g.*, ECF No. 38-9 at 8, 12 (questioning why the district felt "it would be a good idea to force [him] back before the investigation was completed"); ECF No. 38-11 at 17 (emphasizing that he was "forced" and "ordered" back to school). The Court fails to see how the school district's action can be found pretextual in light of Bianchi's statements to school officials advocating for paid leave.

Second, Bianchi cites his transfer as an adverse action, on the theory that he "had no other option but to either return to a racially hostile work environment or transfer to a very undesirable new position." ECF No. 56 at 45. Many courts have permitted a plaintiff to proceed on such a theory—sometimes known as "constructive demotion." *Claes v. Boyce Thompson Inst. for Plant*

*Research*, 88 F. Supp. 3d 121, 126 (N.D.N.Y. 2015). Under this doctrine, "a voluntary transfer to a materially inferior position becomes actionable as a constructive involuntary transfer when an employer creates conditions so difficult or unpleasant that a reasonable person . . . would have been compelled to request and accept the transfer." *United States v. N.Y.C. Dep't of Educ.*, No. 16 Civ. 4291, 2017 WL 435940, at *8 (S.D.N.Y. Jan. 31, 2017). But because Bianchi has not made out a hostile work environment claim, he cannot satisfy the even more demanding standard for a constructive demotion claim.[5] *Cf. Zick v. Waterfront Comm'n of N.Y. Harbor*, No. 11 Civ. 5093, 2012 WL 4785703, at *7 (S.D.N.Y. Oct. 4, 2012) ("Conditions that do not qualify as a hostile work environment under Title VII are, by definition, not sufficiently intolerable to force an employee to quit.").

Third, Bianchi argues that school officials' failure to investigate his complaints thoroughly and fairly is an adverse action. But a number of courts in this Circuit have held that an employer's failure to investigate an employee's complaint does not amount to an adverse employment action. *See, e.g.*, *Price*, 808 F. Supp. 2d at 690; *Richardson v. Suffolk Bus Corp.*, No. 09-CV-3586, 2010 WL 2606266, at *10 n.8 (E.D.N.Y. June 22, 2010) (collecting cases).

Because none of the actions allegedly taken by Defendants amounts to an adverse action, Bianchi's disparate treatment claims fail, and Defendants are entitled to summary judgment on those claims.

---

[5] To the extent Bianchi bases his claim on the fact that his transfer position was more difficult than he had been told, he fails to show that this was anything more than an unintentional oversight. Bianchi cites no evidence to show that Maurice Snipe—the relevant decisionmaker—knew or believed that Bianchi's teaching conditions would be more onerous than he claimed.

**IV.    Retaliation Claims**

Title VII and the NYSHRL prohibit discriminatory retaliation against an employee who complains of an unlawful practice.  "To establish a prima facie case of retaliation . . . a plaintiff must generally show that: (1) he engaged in a protected activity by opposing a practice made unlawful by Title VII; (2) his employer was aware of that activity; (3) he suffered a materially adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action."  *Giscombe v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 396, 401 (S.D.N.Y. 2014).  "An adverse employment action for purposes of a retaliation claim is one that a reasonable employee would have found . . . materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 473 (S.D.N.Y. 2011).  "Adverse employment actions in the context of a retaliation claim cover a broader range of conduct than in the discrimination context."  *Id.*

If the plaintiff succeeds in establishing a prima facie case, "then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory."  *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 220 (E.D.N.Y. 2014).  "If the employer succeeds at the second stage, the presumption of retaliation dissipates, and the plaintiff must show that, but for the protected activity, she would not have been [adversely affected]."  *Id.*

As with his disparate treatment claims, Bianchi's retaliation claims cannot survive summary judgment.  In his opposition materials, Bianchi identifies scores of negative interactions that he had with school officials and co-workers, labelling them all forms of retaliation.  *See generally* ECF No. 56-2.    The Court has reviewed Bianchi's materials and, for the sake of brevity

and judicial economy, limits its analysis to those allegedly retaliatory actions that have an arguable basis in fact or law. *See Davis v. N.Y.S. Dep't of Corrs. Attica Corr'l Facility*, 110 F. Supp. 3d 458, 463 (W.D.N.Y. 2015) (stating that "trivial harms—*i.e.*, those petty slights or minor annoyances that often take place at work and that all employees experience—are not" adverse actions for purposes of a retaliation claim).

First, Bianchi's claim that he was placed on paid leave as retaliation fails. There is no genuine dispute in the record that, once the "blackface" rumor surfaced, Bianchi expressed his discomfort about returning to school. Bianchi suggested staying home from work on multiple occasions and objected to his return in late October 2015. Because Defendants merely implemented a remedy that Bianchi himself had raised, no reasonable juror could conclude that Defendants took an *adverse* employment action against Bianchi or that they did so due to a retaliatory motive.

Second, Bianchi's claim that his transfer was retaliatory fails for similar reasons. Although Bianchi did not view his new position favorably, it is undisputed that he chose to transfer to the new position and was not compelled to do so. Subjectively, Bianchi may have found his present working conditions intolerable, but the Court cannot conclude that Defendants' action was adverse—*i.e.*, that a reasonable worker would be dissuaded from engaging in protected activity merely because the employer assented to the employee's request to transfer to escape sporadic workplace conflicts and some distressing rumors. *Cf. Davis*, 110 F. Supp. 3d at 464 ("A reasonable employee would not consider a mutually-agreeable transfer such as the transfer at issue here materially adverse."); *St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d 287, 327 (E.D.N.Y. 2014).

Third, Bianchi argues that school officials failed to properly handle his complaints in retaliation for his protected activity. The Second Circuit has said that "an employer's failure to

investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint." *Fincher*, 604 F.3d at 716. But it can be "if the failure is in retaliation for some separate, protected act by the plaintiff." *Id.* at 722. Therefore, unlike in the disparate treatment context, an employer's failure to investigate can be an adverse employment action if it occurs in retaliation for an employee's earlier complaint or other protected activity. *See Delisi v. Nat'l Ass'n of Prof. Women, Inc.*, 48 F. Supp. 3d 492, 497 (E.D.N.Y. 2014).

Bianchi argues that Moore, Cromartie, and other district officials began retaliating against him during the 2014-2015 school year, when they failed to adequately investigate his informal complaints about Frances Rogers and Jewell Brown. The problem with this assertion is that Bianchi's complaints during the 2014-2015 school year cannot constitute protected activity. While informal complaints can amount to protected activity, the complainant "must have a reasonable, good faith belief that a Title VII violation has occurred." *Patrick v. Local Union 282*, No. 99-CV-8314, 2005 WL 2179415, at *4 (E.D.N.Y. Sept. 9, 2005). To the extent Bianchi held such a belief, it was not objectively reasonable. Race was not explicitly or implicitly implicated in the various skirmishes between Bianchi and his co-workers, and the mere fact that Bianchi was a different race from his antagonists does not reasonably raise an inference of racial discrimination. *See Anderson v. Univ. Orthopaedic*, No. 16-CV-7311, 2016 WL 10567969, at *4 (S.D.N.Y. Dec. 23, 2016). Rather, the incidents had another, obvious origin: Bianchi and Rogers's conflict over her role at the school. Thus, Bianchi's retaliation claims cannot be founded on the complaints he made during the 2014-2015 school year.

By contrast, Bianchi's September 2015 complaint against Berry and Rogers overtly implicates racial discrimination and therefore constitutes protected activity. Nevertheless,

Bianchi's retaliation claim cannot proceed on the theory that Defendants inadequately investigated his first discrimination complaint due to retaliation, because the "failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint." *Fincher*, 604 F.3d at 716. Accordingly, Bianchi does not have a viable retaliation claim based on how Defendants handled his first complaint against Berry and Rogers.

Bianchi's claim for retaliation based on his second complaint is also not viable. The only causal connection Bianchi shows between the filing of his first complaint and the lack of investigation in his second complaint is temporal proximity. Temporal proximity can, under certain circumstances, suffice to establish the causality element of a prima facie case of retaliation. *See Febrianti v. Worldwide*, No. 15-CV-635, 2016 WL 502027, at *5 (S.D.N.Y. Feb. 8, 2016). But courts should also not ignore other surrounding facts that render such an inference unreasonable. *See id.* Here, the record shows that the school district investigated Bianchi's other formal complaints, including another complaint he filed subsequent to his second complaint. On the present record, it would be unreasonable to infer that Defendants retaliated against Bianchi by refusing to investigate his second complaint but then chose to investigate his third complaint approximately one month later. Additional indicia of retaliatory motive would be required to draw that inference. *Cf. id.* (declining to draw inference of causation from temporal proximity where the events "in no way suggest that the temporal proximity . . . is anything but coincidence").

Regarding Bianchi's third complaint, his claim fails because he has not demonstrated how the third complaint was inadequately investigated. To the contrary, the investigation was extremely thorough and resulted in a written reprimand being issued against Berry. Therefore, Bianchi has not demonstrated an adverse action with respect to the third complaint.

Accordingly, Defendants are entitled to summary judgment on the retaliation claims.

## V. Constitutional Claims

Bianchi brings an equal protection claim under § 1983 against Cromartie and Moore and an equal protection claim under the New York Constitution against all Defendants. Because the Title VII claims are not viable against Defendants, Bianchi's constitutional claims cannot survive summary judgment. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015) ("As in discrimination claims, the elements of a retaliation claim based on an equal protection violation under § 1983 mirror those under Title VII."); *Town of Southold v. Town of East Hampton*, 477 F.3d 38, 52 n.3 (2d Cir. 2007) (noting that the equal protection clauses of the Federal and State Constitutions are coextensive).

In sum, for the reasons discussed above, Defendants' motion for summary judgment is granted as to all three defendants.

## VI. Defendants' Motion for Miscellaneous Relief

Defendants request that the Court:

1. Exclude from consideration for purposes of summary judgment:
   a. Bianchi's audio recordings;
   b. Exhibits "C5" and "C6"; and
   c. Exhibit "U".
2. Strike Bianchi's opposition because he failed to redact minors' names in accordance with Federal Rule of Civil Procedure 5.2.
3. Seal various exhibits that contain confidential or personal information.

The Court has already dealt with many of these requests in the course of evaluating Defendants' motion for summary judgment. As to the remaining requests, the Court declines to wholly strike Bianchi's opposition or his supporting documents on the ground that he filed confidential information publicly. However, the Court agrees that, given the sheer amount of sensitive information contained in Bianchi's opposition materials, they should be sealed. Therefore, the

Clerk of Court is directed to seal Bianchi's opposition to Defendants' motion for summary judgment (ECF No. 56) and all related exhibits and materials.

## CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment (ECF No. 38) is GRANTED. The complaint is DISMISSED WITH PREJUDICE, and the Clerk of Court is directed to enter judgment in Defendants' favor and close this case.

Defendants' motion for miscellaneous relief (ECF No. 57) is GRANTED IN PART and DENIED IN PART. The Clerk of Court is directed to seal Bianchi's opposition to Defendants' motion for summary judgment (ECF No. 56) and all exhibits and materials included therewith.

IT IS SO ORDERED.

Dated: September 30, 2019
      Rochester, New York

                              _____
                              HON. FRANK P. GERACI, JR.
                              Chief Judge
                              United States District Court